[No. 25169-4-I.  Division One.  January 14, 1991.]

*In the Matter of the Adoption of*
INFANT BOY CREWS.

TAMMY LEE CREWS, *Appellant,* v. HOPE SERVICES,
ET AL, *Respondents.*

*Daniel R. Fjelstad* and *Goodwin, Grutz & Scott,* for appellant.

*Albert Lirhus* and *Dubuar, Lirhus & Engel,* for respondent Hope Services.

*Edward Lindstrom,* for respondents prospective adoptive parents.

*Andrew L. Benjamin,* for respondent Charles Bertiaux.

*Michele Hinz,* as guardian ad litem.

*Mary Parks* on behalf of the Choctaw Nation, amicus curiae for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Lee Ann Miller, Assistant,* amicus curiae for appellant.

SCHOLFIELD, J.—Tammy Lee Crews appeals the trial court's order denying her motion for summary judgment, granting summary judgment to Hope Services, and dismissing Crews' petition to vacate the order terminating parental rights. We affirm.

## FACTS

Crews, at the time age 22 and unmarried, gave birth to B. on May 22, 1989. Prior to the child's birth, Crews sought counseling with Hope Services to determine whether to give the child up for adoption. On May 1, 1989, Crews, accompanied by the child's natural father, Charles Bertiaux, went to the Hope Services office, where she signed a "Consent to Termination/Adoption and Waiver of Right to Receive Notice of All Proceedings" form.

The form indicated that Crews understood that she was giving up all legal rights to the child. The form went on to state that the consent given was subject to superior court approval and that such approval would not be sought until a minimum of 48 hours after it was signed, or until 48 hours after the child was born, whichever came later.

With respect to revocation, the form stated that Crews understood that consent was revocable at any time before its approval by the court; however, after approval, the consent was only revocable for fraud or duress practiced by the agency requesting the consent or for lack of mental competency at the time it was executed, and in no case later than 1 year after signing.

Finally, the form also indicated that the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901 *et seq.* did not apply. With respect to this part of the form, Crews' version of the discussion about her having any Indian ancestry differed from the account provided by Mary Struck, the Hope Services counselor, and by Bertiaux.

According to Crews, at a meeting with Struck in April, Struck inquired whether Crews had any Indian blood. Crews responded that she did, but did not know how much. Struck then told Crews that an investigation into potential tribal affiliation would delay the adoption, and might require that the baby reside in a foster home. Struck advised Crews not to mention her Indian blood to anyone, stating, "What I don't hear, I don't know."

Bertiaux's version of the conversation was that it took place on May 1, 1989, the date the consent form was signed. According to Bertiaux, Struck asked whether either Crews or Bertiaux had any Indian blood. Bertiaux indicated he was not sure because he was adopted. Crews indicated that there might be some Indian blood on her mother's side, but she had no information because her mother had been adopted. Crews indicated that her father's heritage was German. Struck then explained the ICWA, after which Crews stated that even if there was some Indian blood on her mother's side, it was not enough to make a difference.

According to Struck's affidavit, she never told Crews to hide or suppress her Indian heritage. Her affidavit indicates that after the discussion, it was clear to her that the ICWA did not apply because Crews was not a member of a tribe and could not name any Indian tribes in her heritage.

Crews was apparently quite thorough in examining all of her options in planning for the child. She spoke with other birth mothers, counseled with her clergyman, received advice from a number of sources, and read literature on the subject. According to Struck, Crews' parents were opposed to having the baby placed for adoption. According to Bertiaux, Crews' parents pressured her intensely to keep the baby, telling her that if she gave the baby up for adoption, she would no longer be a part of their family.

Crews and Bertiaux reviewed agency profiles on several prospective adoptive couples, and ultimately selected Rick and Sharon Shaffer, the adoptive couple in this case. A few days after signing the consent form, Crews and Bertiaux met with the Shaffers at Hope Services. Ten days later,

Sharon Shaffer again met with Crews. Both meetings were pleasant, and Crews informed Mrs. Shaffer at the second meeting that she was positive about her decision to place the child.

On May 24, 1989, 2 days after the birth of B., the trial court entered an order presented by Hope Services, terminating the parental rights of both Crews and Bertiaux. Also on this date, Crews was discharged from the hospital and the Shaffers took the baby home after Crews' pastor performed a ceremony dedicating the baby to his adoptive parents.

Crews then went to stay with Bertiaux's parents, and according to her affidavit, she telephoned Struck on May 26, 1989, asking to have B. returned to her. However, according to Struck, she spoke with Crews on May 25, 1989, and Crews was doing fine. According to Struck, it was on May 30, 1989, that Crews first said she wanted to change her mind.

Approximately a month later, Struck first learned that Crews claimed to have Choctaw and Umatilla blood. Struck requested the attorney for Hope Services to contact these tribes for information. As of July 11, 1989, the Choctaw Nation of Oklahoma had no Certificate of Degree of Indian Blood for Crews. No response was obtained from the Umatilla tribe.

On August 24, 1989, Crews filed a "Revocation of Consent to Termination/Adoption" form, alleging that the consent form was invalid because it did not comply with the ICWA and that execution of the form was the product of fraud, overreaching, or duress. On September 6, 1989, Crews filed a petition to vacate the order terminating her parental rights.[1] Hope Services, the prospective adoptive parents, and Bertiaux appeared in the action. A guardian ad litem, Michele Hinz, was appointed.

---

[1] The copy provided to the court has a date of August 30, 1989, but is not file stamped.

On September 19, 1989, Crews and her father were enrolled as members of the Choctaw tribe. On October 11, 1989, Crews filed a motion for summary judgment, arguing that her consent to terminate her parental rights was obtained in violation of the ICWA, or alternatively, that she timely revoked her consent under the act. Crews also argued that if the act did not apply, she was denied due process by the Washington statutory scheme.

A hearing was held on the motion on November 3, 1989. On November 14, 1989, the trial court entered an order denying Crews' motion for summary judgment and granted Hope Services' motion for summary judgment and dismissed Crews' petition.

This appeal timely followed.[2]

## ICWA

Adoption is a creation of statute and was not recognized at common law. See In re Parsons, 76 Wn.2d 437, 457 P.2d 544 (1969). The statutory requirements for completion of an adoption proceeding under Washington law are contained in RCW 26.33. In summary, the statutes require that a petition for relinquishment and consent to adoption must be filed with the court. These documents may be filed before the child's birth, unless the child is an Indian child, in which case the documents may not be filed until the child is 10 days old. RCW 26.33.080. The petition must contain a statement alleging whether the ICWA applies. RCW 26.33.040(1).

Court approval must be obtained for the petition for relinquishment. A hearing on the matter may not be held until the child is 48 hours old, or until 48 hours has passed since the signing of the documents, whichever is later. In the case of an Indian child, the time period is 10 days. The parent is not required to personally appear to give consent unless ordered to do so by the court. However, if the child is an Indian child, the parent is required to personally

---

[2]At oral argument, this court was notified that a decree of adoption has been entered.

appear. If the court approves the petition, custody is given either to the placement agency or to the adoptive parents. The court also enters an order terminating the parent–child relationship. RCW 26.33.090.

Consent to adoption may be revoked at any time until it is approved by the court. After court approval, consent may not be revoked, except that within 1 year of approval consent may be revoked for fraud, duress, or mental incompetency at the time of signing. After 1 year, consent may not be revoked for any reason. In the case of an Indian child, consent may be withdrawn for any reason until the entry of a final decree of adoption. Thereafter, consent may be withdrawn for fraud or duress within 2 years of the final decree of adoption. RCW 26.33.160.

Applying these statutory requirements to the facts before us, there is no dispute that Hope Services operated in a procedurally correct fashion if the ICWA does not apply. Although consent was obtained from Crews prior to B.'s birth, court approval was not granted until 2 days after the child was born. The petition recited that the ICWA did not apply.

Therefore, Crews' revocation came too late, unless she can claim fraud or duress in the obtaining of her consent or the ICWA applies. Nothing in Crews' recitation of the facts indicates that she was induced, either by fraud or duress, to sign the consent form. She acknowledges that the ICWA was explained to her by Struck. Crews' only allegation that in any way suggests fraud is her statement that Struck told her to "keep quiet" about her Indian heritage. However, even if the allegation were true, it is not relevant to fraud concerning *Crews' consent*.

Thus, Crews' revocation of her consent to adoption could only be valid if the ICWA applies. The ICWA provides for specific standards for removal and placement of Indian children as follows:

### § 1902. Congressional declaration of policy

The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to

promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

The definitional subsection defines an Indian child as follows:

> "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe;

25 U.S.C. § 1903(4).

In the absence of express congressional legislation, a tribe has complete authority to determine all questions of its own membership, as a political entity, and the Secretary of the Interior is authorized to create a final roll of membership for any tribe, pursuant to 25 U.S.C. § 163. 41 Am. Jur. 2d *Indians* § 2 (1968). In its brief, the Choctaw nation asserts that it defines membership as follows:

> The Choctaw Nation of Oklahoma shall consist of all Choctaw Indians by blood whose names appear on the final rolls of the Choctaw Nation approved pursuant to Section 2 of the Act of April 26, 1906 (34 Stat. 136) and their lineal descendants.[3]

Brief of Amicus Curiae, at 9.

Thus, Crews and the Choctaws argue that no formal enrollment process is required, and that Crews and B. have been members since their birth, such that B. is an Indian child, and his adoption is subject to the ICWA. In support of this argument, the Choctaws cite language contained in *United States v. Broncheau,* 597 F.2d 1260 (9th Cir. 1979):

> Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative.

*Broncheau,* at 1263. *Broncheau* dealt with federal criminal jurisdiction and concerned whether an individual was

---

[3]The brief refers to documents in the record that appear not to have copied well. No party appears to take issue with this definition of membership.

"Indian", not whether he was a member of a particular tribe.

If we were to accept the notion that B. could be a member of the Choctaws without formal enrollment, this would be a departure from the language contained in 25 U.S.C. § 1903, which distinguishes between a child who is a member, and a child who is eligible for membership. The affidavit from Brenda Hampton, the Director of Tribal Membership of the Choctaws, suggests an interpretation of Choctaw membership consistent with 25 U.S.C. § 1903.

Hampton stated in her affidavit that Crews was "admitted to tribal membership based upon her proof of direct blood lineage from an original enrollee of the Choctaw Nation." The affidavit goes on to note that B. will be "admitted to membership upon the processing of necessary paperwork", and states that Crews "has been eligible for membership in the Tribe since her birth."

Thus, it would appear that the distinction contained in § 1903 applies to the Choctaws as well as other Indian tribes. It is not disputed that Crews' enrollment occurred on September 19, 1989. The ICWA would presumably apply to the adoption proceeding, had it been commenced after this date. However, court approval of the petition for relinquishment and consent to adoption occurred on May 24, 1989, almost 4 months earlier.

Policy dictates that this court must hold that a determination as to whether the ICWA applies must be made at the time the petition is approved. The public policy of the State of Washington as set forth in the adoption statutes is to provide for the best interests of the child, to achieve finality in the placement of children, and to promote stability in family relationships. *In re Baby Girl K.,* 26 Wn. App. 897, 615 P.2d 1310 (1980).

Although the primary policy consideration when dealing with an Indian child is that of promoting the stability and security of Indian tribes and families, concern for finality in Indian placements is also present. This is evidenced by 25 U.S.C. § 1913(d), which permits revocation of consent after

the entry of the final decree of adoption for fraud or duress only within 2 years of the entry of the decree.

A number of judicial decisions construing the ICWA have addressed the policy question of finality. In *In re Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982), a case setting forth an "Indian family" exception under which the court declined to apply the ICWA when the child's primary cultural heritage was not Indian, the court noted in support of its decision not to apply the ICWA, that the child was enrolled as a tribe member subsequent to the initiation of the court proceedings and contrary to the mother's wishes. *Baby Boy L.*, 643 P.2d at 174.

In *In re Adoption of T.N.F.*, 781 P.2d 973 (Alaska 1989), *cert. denied sub nom. Jasso v. Finney* __ U.S. __, 108 L. Ed. 2d 616, 110 S. Ct. 1480 (1990), the court applied a state's 1–year statute of limitations to a mother's attempt to revoke her consent more than 1 year but less than 2 years following the entry of a final decree of adoption. The decision noted that the ICWA only mentions revocations based on fraud or duress, but provides no time limits for revocations based on other grounds. The *T.N.F.* court criticized the statements of commentators who argued that adoptive placement orders obtained in violation of the ICWA were void and could be challenged at any time.

The *T.N.F.* court stated that it would be inconsistent to allow collateral attack on a consent obtained in violation of the ICWA to be brought at any time, but to limit collateral attacks based on fraud or duress to 2 years. The opinion discussed the policy concern of finality as follows:

> As a matter of policy, both the two–year federal statute of limitations in § 1913(d) and the one–year limitation in AS 25.23.140 recognize that at some point adoptions must become final. To allow collateral attacks on final adoption decrees at any time threatens to unreasonably disrupt the upbringing of the adopted child. . . .
> Section 1914 seeks to enforce important federal procedural rights contained in ICWA. However, this interest must be balanced against the adoptive family's interests. At some point,

the adopted child's relations with his or her adoptive parents needs protection from further disruption.

*T.N.F.,* at 980.

While the *T.N.F.* holding is not directly applicable to the facts before us, the principles are similar. The overriding concern of providing finality and stability in the adopted child's life dictates the result that his or her status as an Indian child or a non–Indian child must be determined with reference to the time of the court approval of the petition for relinquishment and the entry of the order terminating parental rights. As noted above, B. was not an Indian child on May 24, 1989, when Crews' parental rights were terminated. Therefore, the ICWA does not apply.

### NONCOMPLIANCE WITH WAC 388–73–044(7)

RCW 26.33.040 requires every petition for relinquishment to declare whether the ICWA does or does not apply. This means that a placement agency must inquire about the child's heritage. Crews asserts that former WAC 388–73–044(7) imposes obligations greater than mere inquiry on an adoption agency as follows:

> When foster care or adoptive placement of a non–enrolled Indian child is planned, the Portland area office of the bureau of Indian affairs' form "family ancestry chart," or appropriate equivalent, shall be compiled. Appropriate steps shall be taken to enroll eligible children in their respective tribes.

Similarly, Crews contends that state courts also have a duty of inquiry. The Bureau of Indian Affairs (BIA) has published "Guidelines for State Courts: Indian Child Custody Proceedings", 44 Fed. Reg. 67,584–95 (1979), a document explaining the circumstances that trigger inquiry by the court into a child's status. The guidelines provide:

> (c) Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include but are not limited to the following:
> (i) Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
> (ii) Any public or state–licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

(iii) The child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.

(iv) The residence or the domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.

(v) An officer of the court involved in the proceedings has acknowledged that the child may be an Indian child.

*In re Colnar*, 52 Wn. App. 37, 40, 757 P.2d 534, *review denied*, 111 Wn.2d 1023 (1988) (quoting 44 Fed. Reg. 67,586). *Colnar* concerned a termination of parental rights following a dependency finding, not a voluntary placement for adoption. The *Colnar* court noted that the BIA guidelines were published to clarify a provision contained in 25 U.S.C. § 1912(a), regarding notice to the tribe in an involuntary proceeding:

**(a) Notice; time for commencement of proceedings; additional time for preparation**

In any involuntary proceeding in a State court, *where the court knows or has reason to know that an Indian child is involved,* the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . ..

(Italics ours.)

The tenor of Crews' argument seems to be that if Hope Services and/or the court had properly carried out their respective duties of inquiry, Crews, and possibly B., would have been enrolled in the Choctaw tribe at the time of the hearing on the petition for relinquishment, such that B. would have been an Indian child under the ICWA.

  With respect to the duties of the court, Crews' argument must fail. In *Colnar*, the duty to apply the BIA guidelines was predicated on the requirements of § 1912 to ensure proper notice to the tribe and the parents in an involuntary termination. Crews cites no similar provision relating to voluntary terminations or placements. However, even if the duty to apply BIA guidelines applied to voluntary terminations, the facts in this case do not fall within any of the BIA guidelines.

Crews argues that subsection (ii) applies, because Hope Services had discovered information suggesting that B. was an Indian child. This is incorrect. Even assuming that Crews' version of the conversation with Struck is correct (under a summary judgment standard), Crews told Struck that she had Indian blood, but did not know how much. Struck alleges in her affidavit, and Crews does not dispute, that Crews indicated she was not a member of any tribe and could not name any tribes in her heritage. Bertiaux alleges in his affidavit, and this is not disputed by Crews, that Crews stated that the Indian blood was on her mother's side, but that she had inadequate information because her mother was adopted. When asked about her father, Crews indicated that he was *German.* No mention was made of her father's Indian heritage, and certainly no mention was made of the Choctaw tribe, the only tribe in which Crews has been enrolled. None of this information would suggest to the agency that B. was an Indian child, as defined in 25 U.S.C. § 1903(4).

█ With respect to Hope Services' duty to inquire, WAC 388–73–044(7) does place a duty on the adoption agency to take steps toward enrollment of an Indian child. The administrative regulation defines "Indian" more broadly than the applicable provision in the ICWA:

(2) For the purposes of these rules, the term "Indian" includes the following groups:
(a) An enrolled Indian:
(i) Any person who is enrolled or eligible for enrollment in a recognized tribe.

WAC 388–73–044. Here again, the information imparted to Struck by Crews did not suggest that B. was eligible for enrollment in a recognized tribe. Crews' statements failed to suggest any relationship with an identifiable tribe and gave her no positive leads to enable her to discover any tribal affiliation. Therefore, we hold that the conversation between Crews and Struck did not give rise to a duty on Hope Services' part to conduct such an investigation.

In addition, even if we were to hold that Hope Services had breached its duty to investigate, it is pure speculation to argue that had such an investigation been conducted, the outcome would have been that either B. or Crews would have been an enrolled member of a tribe at the time the order terminating parental rights was entered.

The information Struck received from Crews would not have yielded any information on affiliation with the Choctaw tribe. In addition, even if we were to assume that an investigation by Hope Services would have yielded the information that B. was eligible for enrollment in the Choctaw tribe, this does not necessarily mean that he would have been an Indian child as defined by the ICWA on May 24, 1989. It is entirely speculative to state that Crews would have enrolled herself prior to May 24, 1989. Her father had taken no steps to enroll himself, nor, apparently, had he even told his daughter about her Indian ancestry. Even if Crews had known of her Indian ancestry prior to May 24, 1989, she may well not have enrolled herself.

Crews also argues that Hope Services itself had an affirmative obligation to enroll B. as a tribal member. While it is true that former WAC 388–73–044(7) states that "[a]ppropriate steps shall be taken to enroll eligible children", such a duty does not arise under these specific facts. Although the regulation refers to "adoptive placement", we do not believe that such language can refer to a time prior to court approval of the petition terminating parental rights. Prior to this time, the agency has no legal rights in or responsibilities for the child. These rights and responsibilities remain with the natural parents until their parental rights are terminated. To hold that the State requires an adoption agency to enroll a child as a member of an Indian tribe prior to the termination of the biological parents' parental rights would invade the parents' due process rights to raise their children as they see fit. This is especially true when the relinquishment is entirely voluntary as it was here.

## Due Process

The fourteenth amendment to the United States Constitution provides in part that no "state [shall] deprive any person of life, liberty, or property, without due process of law . . .". Article 1, section 3 of the Washington State Constitution likewise provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

In *Stanley v. Illinois,* 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972), the United States Supreme Court described the importance of family as follows:

> The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "[r]ights far more precious . . . than property rights[.]" "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . ..

(Citations omitted.) *Stanley,* at 651.

Due process requires notice and opportunity for a hearing appropriate to the nature of the case. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652 (1950). Procedural safeguards should be tailored to the specific function to be served. *See Goldberg v. Kelly,* 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). Consideration must also be given to the nature of the interest affected, the manner in which a procedure is conducted, the reasons for doing the procedure, the available alternatives to the procedure, and a balance between the injury complained of and the good accomplished. *See Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 163, 95 L. Ed. 817, 71 S. Ct. 624 (1951) (Frankfurter, J., concurring).

Crews argues that the statutory scheme contained in RCW 26.33, which gave her only 48 hours after B.'s birth to revoke her consent to the adoption (or would have given her 48 hours after signing had she signed the document

after birth) and which does not require the mother to appear at the relinquishment hearing and place her consent on the record, violates due process. Crews quotes the United States Supreme Court concerning the compelling nature of a termination proceeding:

> When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. . . .
>
> . . . Few forms of state action are both so severe and so irreversible.

*Santosky v. Kramer,* 455 U.S. 745, 759, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982).

However, *Santosky* and the other cases cited by Crews concern involuntary termination of parental rights initiated by the State to deprive the parent of his or her rights in their child. There is no "state action" in a voluntary termination proceeding to trigger due process concerns. In *In re Hernandez,* 25 Wn. App. 447, 607 P.2d 879 (1980), a mother who had voluntarily relinquished her child for adoption sought to set aside the court's relinquishment order. Hernandez argued that she was denied due process of law because she was not provided with an attorney at the relinquishment hearing.

The *Hernandez* court noted that there is a substantial difference between adversarial dependency and termination proceedings on the one hand, and relinquishment upon the written consent of the parent on the other. Although court approval must be obtained before a child can be relinquished to an adoption agency, the proceedings are entirely voluntary and nonadversarial.

The *Hernandez* court described the circumstances before it as follows:

> Here [Hernandez] was not "deprived of liberty" in the traditional sense. Instead, after much personal reflection, she voluntarily decided to terminate her rights as a parent. Unlike dependency proceedings, this case did not involve a contest between the parent and the superior powers of the State. On the contrary, the State played no role in [Hernandez'] decision to relinquish custody . . ..

*Hernandez,* at 452.

The due process clause acts as a limitation on the State's power, but it does not impose an affirmative obligation on the State to "ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cy. Dep't of Social Servs.*, 489 U.S. 189, 195, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989). Therefore, in the absence of the required "state action", Crews' due process claim must fail.

However, even if we were to determine that Crews had a due process right in this adoption proceeding, no change in the statutory procedures would be necessary. Analysis of a claimed violation of due process requires the examination of three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

The private interest affected is, of course, the parent–child relationship. As argued in the Hope Services brief, the statutory scheme allows little chance of erroneous deprivation. In this setting, "erroneous" presumably means "not voluntary." No person or agency can force a parent to voluntarily relinquish a child. If that were to occur, the statutory scheme provides for revocation of the consent based on grounds of fraud or duress.

Crews argues that 48 hours after childbirth is too short a period to allow for revocation. However, the running of the clock is initiated, not solely by the statutory scheme, but through a parent's *voluntary* signature on the relinquishment form. For the parent who changes his or her mind, no time period would be long enough. The government has an interest in providing finality to adoption proceedings to ensure the welfare of the adopted child. Crews fails to show that additional or substitute procedures are required.

The judgment of the trial court is affirmed.

PEKELIS, J., concurs.

BAKER, J. (dissenting)—I respectfully dissent.

The majority opinion must be read in light of Congress's findings and declaration of policy in the Indian Child Welfare Act (ICWA). Among its findings, Congress stated:

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;
>
> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non–Indian foster and adoptive homes and institutions; and
>
> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901.

Congress further declared that the policy of this Nation is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families[.]

25 U.S.C. § 1902.

The requirements of the ICWA have been integrated into Washington adoption law. *See* RCW 26.33. The State of Washington, as amicus curiae in this case, has aptly stated that federal and state policies on Indian child welfare protect not only those with strong Indian cultural identities, but also those, like Tammy Crews and her son, who may have lost their tribal ties due to past practices that inordinately separated Indian people from their tribal culture. Evidence presented at congressional hearings prior to the enactment of the ICWA showed that 25 to 35 percent of all Indian children had been separated from their families and

placed in adoptive families, foster care, or institutions. *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 104 L. Ed. 2d 29, 109 S. Ct. 1597, 1600 (1989) (citing *Indian Child Welfare Program: Hearings Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs,* 93d Cong., 2d Sess. 15 (1974)).

Amicus curiae the State of Washington goes on to state:

> The promise of the ICWA and state Indian policies is that Indian people and their tribes will be given both the opportunity to maintain existing ties and to establish and nurture new relationships, thereby returning to the tribes a resource that Congress has deemed fundamental to their continued existence. 25 U.S.C. § 1901.

Brief of Amicus Curiae State, at 19.

The class of persons Congress intended to benefit under the ICWA includes not only children who are members of an Indian tribe, but also children who "are *eligible* for membership in an Indian tribe". (Italics mine.) 25 U.S.C. § 1901(3). The legislative history strongly reflects this concern:

> This minor, perhaps infant, Indian [who is eligible for enrollment in a tribe] does not have the capacity to initiate the formal, mechanical procedure necessary to become enrolled in his tribe to take advantage of the very valuable cultural and property benefits flowing therefrom. Obviously, Congress has the power to act for their protection. The constitutional and plenary power of Congress over Indians and Indian tribes and affairs cannot be made to hinge upon the cranking into operation of a mechanical process established under tribal law, particularly with respect to Indian children who, because of their minority, cannot make a reasoned decision about their tribal and Indian identity.

H.R. Rep. No. 1386, 95th Cong., 2d Sess. 17 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 7530, 7539.

Congress declared that the "best interests" of Indian children are protected by the establishment of minimum federal standards for the removal of Indian children from their families. 25 U.S.C. § 1902. Those federal standards purposely inject uncertainty and lack of finality into the adoption of Indian children. For instance, the mother of an Indian child may revoke her consent to adoption for any

reason at any time up to the final decree of adoption. 25 U.S.C. § 1913(c). On the other hand, under Washington law the mother of a non–Indian child may only revoke her consent to adoption within 48 hours after court approval and termination of her parental rights. RCW 26.33.160(2). The concept of "best interest" when it comes to an Indian child embraces not only the usual · concerns of finality in´ the placement of children and stability in family relationships, but also the preservation and promotion of tribal ties. *See* 25 U.S.C. § 1902. As the majority here acknowledges, this is "the primary policy consideration when dealing with an Indian child". Majority, at 210.

Further evidence of the uncertainty purposely injected into Indian child adoptions is that a consent to adoption obtained through fraud or duress may be withdrawn until 2 years after the final decree of adoption, whereas in the case of a non–Indian child such consent may only be withdrawn within 1 year. 25 U.S.C. § 1913(d); RCW 26.33.160(3). Furthermore, the termination of parental rights underlying an Indian child adoption may be collaterally attacked even after the adoption decree is final, upon a showing that one of the procedural safeguards of the ICWA was not complied with. *See* 25 U.S.C. § 1914; *In re Adoption of T.N.F.,* 781 P.2d 973, 978 (Alaska 1989), *cert. denied sub nom. Jasso v. Finney,* __ U.S. __, 108 L. Ed. 2d 616, 110 S. Ct. 1480 (1990).

It is against this background of the purposes and intent of the ICWA that the majority opinion must be read. The majority holds:

> The overriding concern of providing finality and stability in the adopted child's life dictates the result that his or her status as an Indian child or a non–Indian child must be determined with reference to the time of the court approval of the petition for relinquishment and the entry of the order terminating parental rights.

Majority opinion, at 212.

Instead of providing for greater stability in the lives of· adopted Indian children, however, the majority opinion condones adoption practices which create instability and

which flaunt the laws and regulations designed to protect the integrity of Indian communities. This case is a clear example of the disruption that can be caused by condoning such adoption practices.

It is not disputed by either Mary Struck, counselor for Hope Services, or by Charles Bertiaux, the natural father, who opposes Crews' action to seek return of her child, that Tammy Crews told Struck she did have Indian blood, but did not know how much. This statement should have raised an alarm for the adoption agency counselor. Instead, because Crews lacked knowledge of her tribal affiliation, Struck ended all inquiry and concluded, "it was clear to me that the [ICWA] did not apply".[4]

Struck lacked the necessary information and authority to make this determination. Given the information that Crews provided, Struck's duty was to investigate Crews' tribal affiliation and then request a determination of B.'s Indian status from his tribe or tribes. WAC 388–73–044(7) requires that an adoption agency compile a "family ancestry chart" when planning the adoptive placement of a nonenrolled Indian child. "Indian" for purposes of this regulation is defined to include persons who are not enrolled but are "eligible for enrollment in a recognized tribe." WAC 388–73–044(2). There is no dispute that B. at all times met this definition; therefore, Hope Services was obligated to compile a family ancestry chart.

Hope Services' inquiry would have had to go no further than Tammy Crews' own parents, both alive and residing at a known address in Seattle, to discover that her tribal heritage lay with the Umatilla and Choctaw tribes. Tammy's father shortly thereafter supplied information showing that

---

[4] If Crews' version of the conversation is credited, then it seems that she and Struck conspired to avoid application of the ICWA because of the undesirable result of delaying the adoption pending investigation of Crews' tribal affiliation. The United States Supreme Court has made it clear that, because of the tribe's overriding interest in promoting ties with its members, the parent of an Indian child cannot by her actions avoid applicability of the act. *See Mississippi Band of Choctaw Indians,* 109 S. Ct. at 1608–10.

he and Tammy were lineal descendants of Fannie Wolf, an original enrollee of the Choctaw Nation of Oklahoma.[5]

Hope Services' next obligation was to consult with the Local Indian Child Welfare Advisory Committee (LIC WAC) on case planning, development and service delivery, former WAC 388–73–044(11)(a), and to contact B.'s tribe or tribes and take appropriate steps to enroll him. WAC 388–73–044(7). The majority interprets the duty to take steps to enroll the child as not becoming operative until *after* parental rights have been terminated. On the contrary, the regulation imposes this duty in the planning stages, before an adoptive placement is made: "When . . . adoptive placement of a non–enrolled Indian child is *planned, . . .*". (Italics mine.) Placement with the prospective adoptive family typically occurs at the time parental rights are terminated, based on a temporary custody order. *See* RCW 26.33.090(1). The required investigation of Indian status and steps toward tribal enrollment must occur *before* preadoptive placement because, if the child's Indian status is confirmed, then certain preferences as to preadoptive placement must be observed.[6]

The majority states that an agency's enrollment of a child as a member of an Indian tribe prior to the termination of the biological parents' parental rights would invade

---

[5]The fact that Crews mentioned Indian blood on her mother's side and not her father's side does not mean that compliance with the regulation would have been futile. The regulation requires compilation of a "family ancestry chart". It is not restricted to that branch of the family thought to be Indian. Further, it is undisputed that Crews' father knew of his Indian ancestry.

[6]The ICWA, 25 U.S.C. § 1915(b), provides in pertinent part: "In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
"(i) a member of the Indian child's extended family;
"(ii) a foster home licensed, approved, or specified by the Indian child's tribe;
"(iii) an Indian foster home licensed or approved by an authorized non–Indian licensing authority; or
"(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."

the parents' due process rights to raise their children as they see fit. However, WAC 388–73–044(7) only requires that the agency "take appropriate *steps* to enroll eligible children" (italics mine); it does not require that enrollment be *completed* in every case. When the biological parents who still have legal custody of the child oppose enrollment, failure to complete the enrollment process may be justified. However, this question is not before us because Hope Services took *no* steps to enroll the child and the wishes of the biological parents in this regard were never ascertained. Moreover, initiating the process of enrollment would provide at least some, although not legally sufficient, notice to the appropriate tribe or tribes.

The majority also states that even if an investigation by Hope Services had yielded information that B. was eligible for enrollment in the Choctaw tribe, it would be speculative to conclude that Crews would have enrolled herself before her parental rights were terminated 2 days after B.'s birth.

The majority's reasoning is flawed. Had Hope Services complied with its obligations to investigate and taken steps to enroll B., then the order terminating Crews' parental rights would not have been entered when it was, on May 24, 1989. In order to comply with the ICWA and RCW 26.33, which require special treatment of Indian children in adoption proceedings, Hope Services would have been required to await confirmation of B.'s Indian status vel non from the tribe or the Bureau of Indian Affairs (BIA) before processing his adoption as a non–Indian one. If B. was found already to be a member, or was enrolled pursuant to WAC 388–73–044(7), then he would have been an "Indian child" under the ICWA regardless of whether his mother was a member. 25 U.S.C. § 1903(4). Pending an answer from the tribe, Hope Services could have processed the adoption by following two simple steps to ensure legal validity if B. were discovered to be an Indian child. Hope Services could have waited 10 days after B.'s birth before obtaining his parents' signed consents to adoption, and then brought them to appear personally in court to enter their consents on the

record. RCW 26.33.090(1), (3). In addition, Hope Services should have observed the preferences for preadoptive placement set forth in 25 U.S.C. § 1915(b), quoted in footnote 6.

It is undisputed that at least by May 30, 1989, Crews had notified Hope Services that she wanted her baby back. This occurred 8 days after B.'s birth—less than the 10 days Hope Services should have waited before obtaining her signed consent. Thus, Crews' parental rights would not have been terminated by May 24, 1989, if Hope Services had complied with the administrative regulation, because Crews would have used the extra time accorded to parents of Indian children within which to change her mind. The preadoptive placement of B. and the subsequent struggle for his custody would never have occurred.

The trial court also had a duty of inquiry with regard to B. that it failed to perform. The BIA "Guidelines for State Courts: Indian Child Custody Proceedings", 44 Fed. Reg. 67,584–95 (1979) set forth circumstances that trigger an inquiry by the court regarding a child's Indian status under the ICWA. BIA guideline B.1 provides, in pertinent part:

> (a) When a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe.
>
> . . . .
> (c) Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include but are not limited to the following:
>
> . . . .
> (ii) Any public or state–licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

44 Fed. Reg. at 67,586.[7] Thus, the court is charged with knowledge of a child's possible Indian status and must seek

---

[7]While the BIA guidelines are nonbinding, they were followed by Division Two of this court in *In re Colnar*, 52 Wn. App. 37, 39–40, 757 P.2d 534, *review denied*, 111 Wn.2d 1023 (1988), and have been similarly followed by other courts. *See, e.g., Mississippi Band of Choctaw Indians*, 109 S. Ct. at 1609 n.26; *In re M.C.P.*, 153 Vt. 275, 286, 571 A.2d 627, 633 (1989); *In re N.A.H.*, 418 N.W.2d 310,

verification of that status from the child's tribe or the BIA if the adoption agency has discovered information which "suggests" that the child is an Indian child. "Suggests" is a very mild standard. Despite the majority's holding to the contrary, surely a mother's statement that she has Indian blood, but does not know how much, is a suggestion that her child might be Indian.

The majority holds that the BIA guidelines apply only to involuntary terminations of parental rights, not to voluntary terminations as in the present case. The guidelines themselves state to the contrary. Guideline B.1(a), quoted above in part, goes on to state:

> In a *voluntary placement proceeding* where a *consenting parent* evidences a desire for anonymity, the court shall make its inquiry in a manner that will not cause the parent's identity to become publicly known.

(Italics mine.) 44 Fed. Reg. at 67,586. The commentary to that guideline also discusses voluntary proceedings extensively. That the court should have a duty of inquiry in voluntary as well as involuntary termination proceedings is appropriate, since the ICWA is equally applicable to both proceedings.

The majority states that Crews' statements to Struck "gave her no positive leads", majority opinion, at 214, and therefore no duty of inquiry arose on the part of Hope Services or the court. This holding condones Hope Services' violation of WAC 388-73-044(7) and the court's failure to follow the BIA guidelines. The state administrative regulation and the BIA guidelines are both designed to address the problem that Indian child status under the ICWA often cannot immediately be determined. They reflect the unfortunate reality that, due to abusive child removal and adoption practices in the past, Indians are often ignorant of their family histories and tribal affiliations. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 104 L. Ed. 2d 29, 109 S. Ct. 1597, 1600, 1609 n.24 (1989).

---

311 (S.D. 1988); *In re H.D.*, 11 Kan. App. 2d 531, 729 P.2d 1234, 1236-38 (1986); *In re Junious M.*, 144 Cal. App. 3d 786, 193 Cal. Rptr. 40, 43 n.7 (1983).

For this reason, adoption agencies and courts are required to investigate the status of possible Indian children. Their failure to investigate, and the processing of these cases as non-Indian adoptions, only invites later challenges such as this one, which cause great disruption to the lives of the adoptive family as well as the natural family. The policies of finality in adoptions and stability in family relationships, cited by the majority, are better served by complying with Indian child welfare regulations than by ignoring them. As the Vermont Supreme Court recently stated:

> To maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child.

*In re M.C.P.*, 153 Vt. 275, 289, 571 A.2d 627 (1989) (citing Hollinger, *Beyond the Best Interests of the Tribe: The Indian Child Welfare Act and the Adoption of Indian Children*, 66 U. Det. L. Rev. 451, 476–77 (1989)).

The majority concludes with the trial court that prior to September 19, 1989, B. was not an "Indian child" under the ICWA. This determination is not for the court to make. Rather, the tribe should have been notified of the proceedings,[8] and if it chose to intervene, it would have had complete authority to determine whether the child was a member of the tribe. *See In re Colnar*, 52 Wn. App. 37, 39, 757 P.2d 534, *review denied*, 111 Wn.2d 1023 (1988); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32, 56 L. Ed. 2d 106, 98 S. Ct. 1670, 1684 (1978).

---

[8]While federal law mandates notice to the tribe only in involuntary termination proceedings, 25 U.S.C. § 1912(a), Washington law mandates notice to the tribe in voluntary relinquishment proceedings as well. RCW 26.33.090, the statute on voluntary relinquishment proceedings, provides, in pertinent part:

> (2) Notice of the hearing shall be served on any relinquishing parent or alleged father, and the department or agency in the manner prescribed by RCW 26.33.310. *If the child is an Indian child, notice of the hearing shall also be served on the child's tribe in the manner prescribed by RCW 26.33-.310.*

(Italics mine.)

B.'s tribe, the Choctaw Nation of Oklahoma, states that B. has been a member of the tribe since birth. The majority quotes the Chocktaw definition of membership, which amicus Choctaw Nation states comes from its highest law, the Constitution of the Choctaw Nation. The definition provides that the Nation shall consist of all Choctaw Indians whose names appear on the Nation's final rolls, and their lineal descendants. Majority, at 209. Tammy Crews and B. are lineal descendants of Fannie Wolf, whose name appears on the final rolls of the Choctaw Nation. Therefore, the tribe determines that Tammy and B. have been members since birth.

The tribe states that no formal enrollment process is required for membership. A Certificate of Degree of Indian Blood issued by the tribe is *evidence* of membership, not to be confused with membership itself. The BIA guidelines on determining Indian child status acknowledge that in some tribes, this is the case:

> Enrollment is not always required in order to be a member of a tribe. Some tribes do not have written rolls. Others have rolls that list only persons that were members as of a certain date. Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative. *United States* v. *Broncheau,* 597 F.2d 1260, 1263 (9th Cir. 1979)[, *cert. denied,* 444 U.S. 859 (1979)].

BIA guideline B.1 commentary, 44 Fed. Reg. 67,586 (1979).

The majority dismisses the possibility that membership can occur without formal enrollment, despite the BIA's clear statement that it can in some tribes. The majority states that this notion "would be a departure from the language contained in 25 U.S.C. § 1903, which distinguishes between a child who is a member, and a child who is eligible for membership." Majority opinion, at 210. On the contrary, the distinction in the federal statute is meaningful for those tribes that *do* require formal enrollment for membership, but it is inapplicable to the Choctaw tribe. The authority to determine what constitutes tribal membership lies completely with the tribe; neither the trial

court nor this court has any authority to substitute its interpretation of membership for that of the tribe.

The majority cites the affidavit of Brenda Hampton, Director of Tribal Membership of the Choctaw Nation, which suggests a distinction between eligibility for membership and admission to membership based on processing the necessary paperwork. Majority opinion, at 210. Ms. Hampton's affidavit does not have the status of the highest law of the Choctaw Nation, its Constitution, which provides for membership based on being a lineal descendant of an original enrollee, not on enrollment by such lineal descendants. In any event, it was for the tribe to determine B.'s membership status upon receiving notice of relinquishment proceedings concerning B. The trial court's failure to require such notice, in violation of RCW 26.33.090(2), does not mean that an appellate court should now make the membership determination. Rather, the proper procedure would be to remand to the trial court with orders to give notice to the tribe. The tribe could then clarify its own position regarding B.'s membership status. This procedure was followed in *In re Colnar,* 52 Wn. App. at 41, *In re M.C.P.,* 571 A.2d at 634, 642, *In re H.D.,* 11 Kan. App. 2d 531, 729 P.2d 1234, 1239-41 (1986), and *In re Junious M.,* 144 Cal. App. 3d 786, 193 Cal. Rptr. 40, 47 (1983). However, since B. is now indisputably an "Indian child" under the ICWA, such a remand is unnecessary.

In summary, if Hope Services and the trial court had complied with their duties of investigation and had notified the tribe as required, the ICWA would have been recognized as applicable ab initio and this difficult chapter in B.'s life avoided. Instead, the majority condones the agency's and the court's ignoring of regulations designed to address the very problem presented here—that Indian status often cannot immediately be determined due to the lack of knowledge of many Indians about their family histories.

The majority compounds its error by imposing a deadline for determining a child's Indian status that is not found in

the ICWA. The definition of "Indian child" in the ICWA states that the child must be either (a) a member of a tribe, or (b) eligible for membership and the biological child of a member. 25 U.S.C. § 1903(4). This definition does *not* go on to state, ". . . as of the date on which parental rights are terminated." Neither has any judicial decision cited by the majority created such a time cutoff.

The majority's holding in this regard violates three principles of construction of the ICWA recognized in cases interpreting that act. First, it creates an unwarranted judicial exception to the ICWA's coverage. As the court stated in *In re Adoption of T.N.F.,* 781 P.2d 973, 977–78 (Alaska 1989), *cert. denied sub nom. Jasso v. Finney,* __ U.S. __, 108 L. Ed. 2d 616, 110 S. Ct. 1480 (1990):

> State courts must be particularly hesitant in creating judicial exceptions to a federal act which was enacted to counter state courts' prejudicial treatment of Indian children and communities.

Second, the ICWA is a remedial statute designed to protect the rights of Indian people. It should be liberally construed, and any doubtful expressions must be resolved in favor of the rights the act was designed to protect. *See Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 61 L. Ed. 2d 153, 99 S. Ct. 2529, 2537 (1979); *Bryan v. Itasca Cy., Minn.,* 426 U.S. 373, 392, 48 L. Ed. 2d 710, 96 S. Ct. 2102, 2112 (1976). The majority's interpretation of "Indian child" resolves a supposed ambiguity in the act *against* Indian rights by cutting off those rights at an artificially imposed early date.

Finally, the majority's interpretation violates the purpose of the ICWA, discussed above, to protect even those Indian children who have lost their roots and may not be tribal members, but are eligible for membership. *See* 25 U.S.C. § 1901(3), (4). "The ICWA constitutes a scheme enacted by

Congress to ensure that Indian tribal members are pro-
tected, regardless of the lack of present tribal contacts."
*In re Armell,* ___ Ill. App. 3d ___, 550 N.E.2d 1060, 1068,
*appeal denied,* ___ Ill. 2d ___, 555 N.E.2d 374, *cert. denied,*
111 S. Ct. 345 (1990). It is a violation of this congressional
purpose to cut off the tribe's and the child's rights under
the ICWA 2 days after the child's birth because of a lack of
present tribal contacts.[9]

The majority imposes its cutoff for applicability of the
act at the time parental rights are terminated in the name
of providing finality and stability in the life of the adopted
child. Majority opinion, at 212. However, the ICWA and
Washington law permit the parents of an Indian child to
withdraw their consent to adoption not merely until their
parental rights are terminated, but until entry of the final
decree of adoption.[10] While the majority may believe it
desirable to achieve finality in adoptive placements at an
earlier point, Congress has reached a different conclusion
which this court is bound to follow.

[9]The majority opinion fails to deal with the important question whether to
apply the ICWA when the child actually is an "Indian child" at the date of the
termination order, but such information was unknown at the time. This was the
situation of B., according to amicus curiae the Choctaw Nation, which states that
B. has been a member since birth. Furthermore, amicus curiae State of Washing-
ton stated at oral argument that this situation often arises when an absent father
is an Indian, but the non–Indian mother has little or no information about his
Indian status.

[10]25 U.S.C. § 1913(c) provides:
"In any voluntary proceeding for termination of parental rights to, or adoptive
placement of, an Indian child, the consent of the parent may be withdrawn for
any reason at any time prior to the entry of a final decree of termination or adop-
tion, as the case may be, and the child shall be returned to the parent."
Likewise, RCW 26.33.160(4)(g) provides, in pertinent part:
"In the case of a consent to an adoption of an Indian child, . . . [c]onsent may
be withdrawn for any reason at any time prior to the entry of the final decree of
adoption."

232

I respectfully dissent. I would reverse the granting of summary judgment for respondents and grant summary judgment for appellant.

Review granted at 116 Wn.2d 1023 (1991).