[No. 3604-9-III. Division Three. February 26, 1980.]

*In the Matter of the Adoption of*
JUAN REUBEN HERNANDEZ.

MARIA HERNANDEZ, *Appellant,* v. CATHOLIC CHARITIES,
DIOCESE OF SPOKANE, *Respondent.*

448

*Rocco Treppiedi* and *Dan Stormer* of *Spokane Legal Services Center,* for appellant.

*Robert J. Crotty* and *Lukins & Annis,* for respondent.

McINTURFF, J.—Maria Hernandez appeals the denial of her motion to revoke an order authorizing the relinquishment of her child to Catholic Charities for purposes of adoption.

In May 1978, the appellant, Maria Hernandez, age 20 and unmarried, discovered she was with child. After discussing this situation with her mother, Maria decided to enter the DePorres Maternity Home in Spokane, operated by respondent, Catholic Charities. Maria entered DePorres on July 31, and remained there until February 8, 1979, when she gave birth to a son, Juan Reuben Hernandez.

During her pregnancy, Maria received counseling and emotional support from Mary Callan and Tiney Schafer, group life coordinators, and Sally Arney, a caseworker for Catholic Charities. This was a time of turmoil for Maria, as her mother and boyfriend gave conflicting advice regarding her child's future. Upon release from the hospital, Maria returned with her baby to live with her mother in Mabton, Washington. But, soon thereafter, feeling a lack of emotional support, she contacted Ms. Schafer by telephone, asking for help in finding an apartment in Spokane. Upon returning to Spokane on February 17, Maria placed the baby in temporary foster care while she and the staff at DePorres located a suitable apartment.

Although the baby was returned to Maria March 1, during the next 12 days there were many difficulties because the child was crying constantly and she felt inadequate as a parent. These feelings were compounded by the absence of a father, her need for public assistance, and conflicts with her boyfriend and mother.

On March 12, Maria telephoned Ms. Arney, stating she wanted to relinquish her child for adoption. Ms. Arney picked up the child the following day; but for Maria, the turmoil did not end. On March 14, Maria wanted her child back and on that day had lunch with Ms. Callan to discuss her decision and the welfare of the child. The baby was returned to Maria March 14, but before the evening concluded, Maria changed her mind again. Ms. Arney told Maria she must be certain of her decision and to keep the baby until the relinquishment hearing on March 16.

On March 16, Maria, joined by Catholic Charities, petitioned for an order authorizing Reuben's relinquishment to the custody of Catholic Charities. The judge at the relinquishment hearing questioned Maria extensively regarding the nature and effect of her decision and then signed the relinquishment order.

Three days later, on March 19, Maria contacted Ms. Arney requesting the return of her child. Believing it was not in the best interests of the child to continually disrupt his placement, Ms. Arney refused to accommodate Maria's request. On March 22, Maria attempted suicide. After 4 days in a psychiatric ward, she contacted an attorney, who then filed a motion to revoke the relinquishment order. The motion was denied by a different judge and this appeal followed.

■ Maria contends she was denied due process of law because she was not afforded an attorney at the relinquishment hearing.

"[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation" . . . "what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

*Stanley v. Illinois*, 405 U.S. 645, 650, 31 L. Ed. 2d 551, 558, 92 S. Ct. 1208 (1972), and cases cited.

■ "Adoption is a statutory procedure and the propriety of action taken must be measured against the language of the statute." *In re Adoption of Jackson,* 89 Wn.2d 945, 947, 578 P.2d 33 (1978). There are two methods by which a child may be relinquished for adoption in this state. Under RCW 13.34 *et seq.* a child may be declared a "dependent" and following fact–finding and disposition hearings, the court may order the termination of parental rights. Alternatively, a parent may exercise the procedures found in RCW Title 26.

There is a substantial difference in the precise nature of the governmental function under these two separate procedures for termination of parental rights. Dependency proceedings are initiated by a petition alleging that a child has been abandoned, abused, or neglected by his parents or guardian. RCW 13.34.020–.040. Proceedings under RCW 13.34 are adversary in nature and the legislature has declared representation by counsel to be an inherent right. RCW 13.34.090.[1]

Prior to the enactment of RCW 13.34.090, our Supreme Court declared the right to counsel in dependency proceedings was mandated by the constitutional guaranties of due process because:

> the indigent parent has to face the superior power of State resources. The full panoply of the traditional weapons of the State are trained on the defendant–parent, who often lacks formal education, and with difficulty must present his or her version of disputed facts; match wits with social workers, counselors, psychologists, and physicians and often an adverse attorney; cross–examine witnesses (often expert) under rules of evidence and procedure of which he or she usually knows nothing; deal

---

[1] RCW 13.34.090:

"Any party has a right to be represented by an attorney in all proceedings under this chapter, . . .

"At all stages of a proceeding in which a child is alleged to be dependent pursuant to RCW 13.34.030(2), the child's parent or guardian has the right to be represented by counsel, and if indigent, to have counsel appointed for him or her by the court."

with documentary evidence he or she may not understand, and all to be done in the strange and awesome setting of the juvenile court. The right to one's child is too basic to expose to the State's forces without the benefit of an advocate.

*In re Myricks,* 85 Wn.2d 252, 254, 533 P.2d 841 (1975); *In re Luscier,* 84 Wn.2d 135, 138, 524 P.2d 906 (1974).

By contrast, under RCW 26.32.070(1), a child may be relinquished for adoption upon the written consent of the parents. Although relinquishment of the permanent custody of a minor child to an approved agency requires court authorization (RCW 26.36.010), the proceedings here were entirely voluntary and nonadversary.

The private interest at stake here, the integrity of the family unit, has traditionally received zealous protection from the courts. *In re Luscier, supra* at 136; *In re Myricks, supra* at 253. But here, termination of the parent–child relationship was sought by the parent, not the State.

■ Outside the criminal area, the right to legal representation is not well defined. Absent specific statutory guaranties, the appointment of counsel is constitutionally required only when procedural fairness demands. *Tetro v. Tetro,* 86 Wn.2d 252, 254, 544 P.2d 17 (1975). The key issue in determining the necessity of counsel is whether the individual is being deprived of "liberty." *In re Myricks, supra* at 255.

■ Here, Maria was not "deprived of liberty" in the traditional sense. Instead, after much personal reflection, she voluntarily decided to terminate her rights as a parent. Unlike dependency proceedings, this case did not involve a contest between the parent and the superior powers of the State. On the contrary, the State played no role in Maria's decision to relinquish custody; but, in an effort to insure a voluntary and well informed decision, the court did question Maria regarding the nature and effect of her actions.

RCW 26.32 does not require the consenting parent be represented by an attorney. Instead, RCW 26.32.070(3) authorizes the discretionary appointment of a next friend

to inquire into the competency of the consenting parent and the best interests of the child.[2] Our review of the relinquishment hearing reveals no abuse of discretion in the court's failure to appoint a next friend. Furthermore, where the proceedings are voluntary and nonadversary, due process does not require the consenting parent's representation by an attorney.

■ Maria also contends she was denied equal protection of the law because she was not afforded the procedural safeguards available under the dependency statute, RCW 13.34. This argument must also fail since it was Maria, not the State, who decided the manner in which her rights as a parent would be terminated. *See In re George*, 90 Wn.2d 90, 94, 579 P.2d 354 (1978); *Weiss v. Bruno*, 82 Wn.2d 199, 509 P.2d 973 (1973). RCW 26.32.070 authorizes the voluntary relinquishment of a child for adoption upon the written consent of the parent. Proceedings under the dependency statute, which are initiated upon a petition alleging abandonment, abuse or neglect of a child, would appear ill suited to these facts and an unnecessary aggravation of an already difficult situation.

Next, Maria contends the court erred in failing to find she was mentally incompetent at the time she filed the written consent for relinquishment. She bases this claim upon her traumatic childhood, her psychological makeup,

---

[2]RCW 26.32.070(3):

"The court, prior to signing an order of relinquishment, may appoint a next friend, as hereinafter provided in RCW 26.32.090, who shall report to the court either orally or in writing as to the competency of the parent signing the consent, whether or not such consent is voluntary, and whether or not at that time anything affirmatively appears that the best interests of the child would not be served by the adoption. The order of relinquishment shall not be signed without the written approval of the next friend and without the court calling a hearing as to the advisability of the relinquishment, whenever the court appoints a next friend."

RCW 26.32.070 was repealed by the legislature in 1979. Under the newly enacted adoption statute, RCW 26.32, a petition seeking *involuntary* termination of a parent–child relationship is treated as a petition for dependency and subsequent proceedings are governed by RCW 13.34.180. *See* RCW 26.32.032.

and the pressures and stresses with which she was confronted at the time of relinquishment.

■ Under RCW 26.32.070(1), an order authorizing the relinquishment of a child for adoption is not revocable except for mental incompetency or fraud.

A person is regarded as mentally incompetent when he does not possess sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the particular transaction in which he is engaged.

*Tecklenburg v. Washington Gas & Elec. Co.,* 40 Wn.2d 141, 143, 241 P.2d 1172 (1952); *Binder v. Binder,* 50 Wn.2d 142, 148, 309 P.2d 1050 (1957).

There is no doubt Maria experienced an unfortunate childhood. This fact, however, does not detract from her admission that she understood both the nature and effect of her decision to relinquish custody of her child.[3]

Eugene Patterson, M.D., stated Maria did not comprehend "how distraught she would be and how difficult it would be to cope with that decision", but acknowledged

---

[3]At the relinquishment hearing, Judge Shields questioned Maria as follows:

"Q. And, you are asking that you be authorized to relinquish the child to Catholic Charities for purposes of placement and adoption, is that correct?

"A. Yes, sir.

". . .

"Q. And, you understand that you have an absolute right to keep the child if you want him?

"A. Yes, sir.

". . .

"Q. And, you understand that if I approve the relinquishment and the child is surrendered to Catholic Charities, you can't later change your mind?

"A. Yes, sir.

"Q. And, that you will have no right to determine who adopts the child or to find out who the adoptive parents are or have any further contact or communication with the child?

"A. Yes."

At the hearing on the motion to set aside the order of relinquishment, Maria testified:

"Q. Did you understand then that you were giving away your son, Maria?

"A. Yes.

"Q. You understood that the decision was irrevocable; that you couldn't withdraw it; that you couldn't change your mind again?

"A. Yes."

that she had the intellectual capacity to know it was a final decision. While we are sympathetic with Maria's plight, mental incompetency must be proven by clear, cogent and convincing evidence. Our review of the record discloses no error in the trial court's finding of fact. *Tecklenburg v. Washington Gas & Elec. Co., supra* at 143; *Binder v. Binder, supra* at 149.

Maria assigns error to the court's failure to find that her written consent for relinquishment was procured by fraud. She says Catholic Charities breached its fiduciary duty in not informing her of alternatives to relinquishment. During a period of emotional vulnerability, Maria contends the staff at DePorres "pressured" her into the relinquishment decision.

> Fraud . . . in its general sense, is deemed to comprise anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another.

37 Am. Jur. 2d *Fraud and Deceit* § 1, at 19 (1963).

Despite argument to the contrary, the evidence shows Catholic Charities consistently maintained a neutral position as to Maria's decision to relinquish her child for adoption. There was an overall policy at DePorres to allow unwed mothers their own decisions after appropriate counseling; and that Maria was advised of alternatives to adoption.[4]

---

[4]Maria testified:

"Q. What alternatives did she [Sally Arney] give you to have your mother take the child?

"Q. Did she suggest that you could do anything else other than leave your child with your mother for awhile?

"A. Just adoption. Well, yeah. Well, foster care."

Sally Arney testified:

"Q. What options did you discuss with Maria?

"A. We discussed the possibility—at that point, on March 14, at 4:30, the discussion took place when I took Maria to the doctor. And in a doctor's office. And at that point she was saying that she was going to keep the baby, so the options that we talked about were the Woman–to–Woman program, um, if she felt like

After the birth of her child, Maria encountered no opposition, rather support, from Catholic Charities in her decision to retain custody and return to her mother's home. When she decided to return to Spokane, the staff at DePorres consistently supported mother and child, even to the extent of advising her to keep the child with her until the relinquishment hearing so she would be certain of her decision. Ms. Arney said she would not have taken Maria to the courthouse had she indicated any uncertainty; and reported that Maria was "absolutely sure" at that time. Finally, during questioning at the relinquishment hearing, Maria told the judge her decision was voluntary, not pressured by Catholic Charities.

In support of her claim of fraud, Maria places emphasis upon her meeting with Ms. Callan on March 14, when Ms. Callan is reported to have said Maria was not emotionally ready to be a mother. This statement, however, came in response to questions and requests for advice by Maria. Furthermore, despite her meeting with Ms. Callan, Maria was not deterred from her decision, at that time, to regain custody of her child. It was only after the child had been returned to her that she changed her mind about relinquishment.

From the record, we find Catholic Charities made sincere efforts to befriend and counsel Maria; their sole aim was for her to make a knowledgeable decision, independent of outside pressures. The testimony fails to even approach the clear, cogent and convincing proof necessary for a finding of fraud. *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 462, 457 P.2d 603 (1969).

Next, Maria contends the court erred in admitting evidence concerning the best interests of the child. In a

---

she needed more time to make a decision or if she felt like she needed a tentative time away from the baby, foster care was an option talked about. We talked about the possibility of her taking some parenting training classes and some assertiveness training classes. I—I believe we also talked about the importance for Reuben that he be in a stable environment for a while. That he had been moved around a lot."

bench trial, the admission of evidence alleged to be errone-
ous is harmless when the court does not rely on that evi-
dence in reaching its decision.[5] Here, the court ruled that
the welfare of the child was not at issue.[6]

Finally, Maria assigns error to the court's refusal to grant
her motion for continuance. This motion was sought to
present rebuttal testimony concerning the best interests of
the child. Since the court did not rely on this evidence in
reaching its decision, the error, if any, was harmless.

Judgment of the Superior Court is affirmed.

GREEN, C.J., and ROE, J., concur.

Reconsideration denied April 11, 1980.

---

[5]*Combs v. Frigid Food Prods., Inc.*, 67 Wn.2d 862, 865, 410 P.2d 780 (1966);
*Lamb v. Railway Express Agency, Inc.*, 51 Wn.2d 616, 618, 320 P.2d 644 (1958);
*Allen v. Abrahamson*, 12 Wn. App. 103, 108, 529 P.2d 469, 78 A.L.R.3d 461
(1974).

[6]In its memorandum opinion, the court stated:
"Statements have been made during the course of the hearing and in briefs
and arguments concerning the welfare of the child. That is not an issue in this
matter."