65 Wn. App. 631 (1992)
829 P.2d 791
In the Matter of A.S.
S., ET AL, Appellants,
v.
THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Respondent.
No. 11336-1-III.
The Court of Appeals of Washington, Division Three.
May 14, 1992.
As amended by order June 26, 1992.
Michael F. Keyes, for appellants.
Kenneth O. Eikenberry, Attorney General, and Nancy M. Rockwell, Assistant, for respondent.
[As amended by order of the Court of Appeals June 26, 1992.]
GREEN, J.[*]
Mr. and Mrs. S. relinquished their parental rights to their daughter, A., at a hearing in which they waived their right to counsel. Four months later, they moved to vacate the relinquishment order, contending they were misinformed by A.'s caseworker that A. had cerebral palsy. The Superior Court denied Mr. and Mrs. S.'s motion and they appeal. We reverse.
The following evidence was presented at the hearing on the motion to vacate: In February 1990, Mr. and Mrs. S. moved back to Spokane from California to look for work. At the time, their daughter, A., was 1 year 4 months old. They lived with friends for a while. On February 28, Mr. S. took Mrs. S. and A. to live in Ogden Hall. Mr. S. testified he intended to sleep in his car until he earned enough money to afford housing for his family. However, a Child Protective Services (CPS) caseworker removed A. from Ogden Hall *633 almost immediately, based upon bruise marks observed on A.'s face. Mr. and Mrs. S. testified the bruise marks were the result of their attempts to squeeze A.'s mouth open to force her to eat. A pediatrician had recommended A. gain weight, and suggested this course of action to them. Although no dependency or other action was pending, the caseworker informed Mr. and Mrs. S. they would have to participate in parenting services while their daughter was in foster care for between 8 and 12 months.[1] At that point, Mr. and Mrs. S. discussed giving A. up for adoption.
After A. was placed in foster care, the caseworker referred her to a pediatric nurse practitioner for a complete physical examination, which took place on March 1. During the examination, the nurse noticed A. was walking on her tiptoes. She consulted a pediatric textbook, which stated that toe walking may indicate cerebral palsy. The nurse told the caseworker A. should be reevaluated in 1 to 2 months to rule out cerebral palsy.
Mr. and Mrs. S. kept a scheduled appointment with the caseworker on March 15. The caseworker had prepared relinquishment documents, pursuant to Mr. and Mrs. S.'s earlier discussion of that option. Mr. S. testified that prior to the meeting they had "some very strong feelings" as to whether they "were doing the right things". But when they met with the caseworker, she advised them there was a "strong possibility" A. had cerebral palsy. Mr. S. stated they "were just about to change [their] minds when she came up with that". They went ahead and signed the relinquishments.
On March 19, the relinquishment hearing was held. The court asked Mrs. S.:
Q: Why do you want to give her up?
A: Because I feel that, since me and my husband are low income, that she would be better off in a better home with all the medical attention that she can get.
Q: All right. Does she have some medical problems?
A: Yes. She's got cerebral palsy.

*634 Q: She does?
A: Yeah.
(Italics ours.) Mr. S. followed Mrs. S. on the witness stand and testified:
Q: Okay. Why do you want to give [A.] up?

A: The same reasons my wife gave. We can't provide a good home for her.
(Italics ours.) Although the caseworker was present at the hearing and from the audience responded to some questions, neither she nor the Department of Social and Health Services (DSHS) attorney informed the court that cerebral palsy was only a possibility. The court approved Mr. and Mrs. S.'s petitions and entered the relinquishment order on May 14.
Mr. S. testified they had requested A.'s medical records before the hearing, but DSHS never honored that request. Sometime after the hearing, Mr. S. made a direct request to Rockwood Clinic for A.'s files. Those records did not indicate any possible diagnosis of cerebral palsy. On July 20, Mr. and Mrs. S. moved to vacate the order. The Superior Court denied their motion, and this appeal followed.[2]
[1] Once approved by the court, a relinquishment and consent to adoption may not be revoked, except for "fraud or duress practiced by the person, department, or agency requesting the consent, or for lack of mental competency on the part of the person giving the consent at the time the consent was given". RCW 26.33.160(3). Fraud, as used in the predecessor statute to RCW 26.33.160, has been defined by this court as:
anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another.
In re Adoption of Hernandez, 25 Wn. App. 447, 455, 607 P.2d 879 (1980) (quoting 37 Am.Jur.2d Fraud and Deceit § *635 1, at 19 (1968)).[3] Proof of fraud must be by clear, cogent and convincing evidence. Hernandez, at 456.
Utilizing this standard, we are convinced the trial court erred when it denied Mr. and Mrs. S.'s motion to vacate their relinquishments. Specifically, the undisputed evidence is that the caseworker advised Mr. and Mrs. S. there was a "strong possibility" A. had cerebral palsy. In fact, the nurse practitioner who examined A. testified she told the caseworker only that A. should be reevaluated in 1 to 2 months to rule out cerebral palsy. The caseworker made her representation about cerebral palsy to Mr. and Mrs. S. at a time when they were considering the wisdom of choosing relinquishment. Although DSHS argues Mr. and Mrs. S. had already made the decision to relinquish, Mr. and Mrs. S.'s undisputed testimony was that they were about to change their minds when the caseworker told them about the cerebral palsy. Further, the decision to relinquish is not final until the court determines the parent is acting knowingly and voluntarily.
Mr. S. also stated he asked for A.'s medical records prior to the hearing, but CPS did not provide them. When he later obtained those records directly from A.'s medical clinic, he found no mention of cerebral palsy therein. Finally, and perhaps most importantly, Mr. and Mrs. S. clearly advised the court in the original relinquishment hearing that A. had cerebral palsy. The caseworker was present in the courtroom, but did not clarify A.'s condition. She should have taken the opportunity to advise the court that cerebral palsy was only a possible diagnosis. Had she done so, the court could have asked the parents if they understood this fact and made further inquiries to ensure they were making a knowledgeable decision. If this had been done, the appeal would have been unnecessary.
In sum, we hold there is clear, cogent and convincing evidence that CPS, through its caseworker, deceived Mr. *636 and Mrs. S. and the court by "acts, omissions, and concealments" which breached its legal and equitable duties. Hernandez, at 455.
Relinquishments must be clean cut and unclouded by any mistake as to the facts. The permanent loss of one's parental rights is extremely serious. Whether the relinquishment is initiated by the agency or by the parents, a caseworker has a grave responsibility not only to the child, but to the parents and the court, to ensure compliance with the statute. There must be no question that the relinquishment procedure and purposes of the statute have been satisfied in a particular case. Here, cerebral palsy played a significant role in Mr. and Mrs. S.'s final decision to relinquish. In these circumstances, the caseworker's failure to speak undermined the integrity of the relinquishment proceeding.
Consequently, we vacate the relinquishment order.[4]
Reversed.
THOMPSON, J., concurs.
SHIELDS, C.J. (dissenting)
I dissent. The majority concludes there is clear, cogent and convincing evidence that Child Protective Services (CPS), through its caseworker, deceived Mr. and Mrs. S. and the court by acts, omissions, and concealments which breached its legal and equitable duties. Majority, at 635-36. To reach its conclusion, the majority ignores several facts and enhances others.
On March 19, at the relinquishment hearing, the parents confirmed their relinquishment was knowingly and voluntarily *637 made. The court approved it and it is not now revocable except for "fraud or duress practiced by the person, department, or agency requesting the consent ...". (Italics mine.) RCW 26.33.160(3). Revocation requires a showing of fraud or duress practiced by the Department of Social and Health Services (DSHS) personnel involved.[5]
The elements necessary to establish fraud  all of which must be shown by clear, cogent, and convincing evidence  are a representation of an existing fact; its materiality; its falsity; the speaker's knowledge of its falsity; his intent that it shall be acted upon by the person to whom it is made; ignorance of its falsity on the part of the person to whom it is addressed; the lat[t]er's reliance on the truth of the representation; his right to rely upon it; and his consequent damage.
Beckendorf v. Beckendorf, 76 Wn.2d 457, 462, 457 P.2d 603 (1969). This court has also defined fraud more generally as acts and omissions calculated to deceive, by which an undue and unconscientious advantage is taken of another. In re Adoption of Hernandez, 25 Wn. App. 447, 455, 607 P.2d 879 (1980) (citing 37 Am.Jur.2d Fraud and Deceit § 1, at 19 (1968)). The majority utilizes the broader definition of fraud, but under either, the parents' burden of proof is high: clear, cogent and convincing evidence is required to prove fraud. Beckendorf; Hernandez, at 456. Although the parents contend they signed the relinquishments because they were misinformed by the caseworker that A. had cerebral palsy, the record does not support them.
Mr. S. testified A. had various health problems from the time she was born. Within days, the DSHS expressed concern Mr. and Mrs. S. did not have enough experience to care for A. It offered services, including a public health nurse. *638 When A. was just 2 months old, she was readmitted to the hospital. Both parents were unemployed and having difficulty coping with their financial situation, A.'s poor health and DSHS; they voluntarily placed A. in foster care. DSHS provided supervised visitation, parenting classes for Mrs. S. and an anger control program for Mr. S. The parents did not like this interference with their lives, so they packed up A. and moved to California. They were only there for 6 months. Mr. S. attended school to become a machinist, but when they lost their place to stay, he moved the family back to Spokane to find work. They had little money, so they arranged to stay with friends temporarily.
Mr. S. testified A. became ill again, so they took her to Holy Family Hospital. She had an ear infection and yellow skin and was underweight. The pediatrician to whom they were referred recommended a change in diet and told them to force A. to eat so she would gain weight. The parents' efforts resulted in bruises on A.'s cheeks. When the friends criticized their caretaking of A., Mr. S. moved his family. He took the mother and child to Ogden Hall, a residence for homeless women, and lived in his car. Because A. had bruises around her mouth and a bruise on her forehead, CPS removed her from Ogden Hall. The parents were told they would have to participate in family services again.
The decision to relinquish was made before cerebral palsy was discussed. At the hearing to set aside the relinquishments, the parents testified they came to their decision because they had decided they did not want to have to put up with the interference of CPS in their lives any longer. The parents initiated voluntary relinquishment proceedings on March 2, 1990, when they met with the caseworker's supervisor to inform him they wanted to relinquish their parental rights. On March 15, they met with the caseworker to sign the relinquishment documents. At that time, according to the father, the caseworker told them there was a "strong possibility" A. had cerebral palsy. Their decision to relinquish was made at least 13 days before cerebral palsy was mentioned to them. Although the majority states its belief the parents were *639 undecided whether they should sign the relinquishment documents on March 15, the record does not indicate they expressed any reservations to the caseworker.[6] There is no evidence the caseworker relayed the information to the parents to induce them to relinquish their rights.
Nor is there any evidence they were misinformed. The first witness to testify at the hearing to vacate the relinquishment was the nurse practitioner who examined A. on March 1. Concerning the physical and developmental examination, she testified A. had an ear infection, yellow skin tone and a bruise on her face, and was underdeveloped physically. She also was not yet speaking, showed evidence of delayed motor skills and consistently walked on her tiptoes. The nurse testified she became concerned A. could have cerebral palsy:
Q: What did you conclude as to her developmental problems, if any?
A: I wouldn't say I concluded anything. I was concerned and felt that she should be retested within a month or two.
Q: What was your concern specifically?
A: The concern was that she wasn't speaking, and that her motor skills were slightly delayed, also, and we would want to keep a close watch on that.
Q: And because of the toe walking and the motor skills, did you have some specific concerns, in fact an area that you were concerned about?
A: As I read something about toe walking, as I had not examined that many children who walked on their toes, I did some reading in a pediatric textbook, and one of the diagnoses you would want to pursue and rule out in a child that walks on her toes is cerebral palsy, so that was a concern.
Q: Is that why you want the further evaluations in a month or two?
A: Yes. Initially when I did my report I hadn't done that reading, and that wasn't my specific concern; however, with a child with motor delays I would want to pursue that. With [A.] I suggested through the Guild School, that might be appropriate.

*640 Q: To whom did you voice this concern or this thought?
A: To ... the CPS caseworker.
Q: Did you do that immediately after you finished your exam?
A: No. It was  I don't know the exact date. I am thinking one to two days later after I had finished reading.
Thus, the representation was of an existing factual possibility based on the presenting symptoms of A., it was not false, and the speaker did not know it to be false. Based on Beckendorf, there was no fraud. The majority states Mr. S. testified they had unsuccessfully requested A.'s medical records before the hearing. However, he also testified there was no way he could ask for them between March 15 and 19 because there was "only one day" and a weekend intervening.
The majority places importance on the fact the caseworker did not speak up when "Mr. and Mrs. S. clearly advised the court in the original relinquishment hearing that A. had cerebral palsy." Majority, at 635. Mr. S., however, did not state A. had cerebral palsy. In fact, he did not mention it at all. More importantly, there is no showing the caseworker's failure to speak up at the hearing to correct Mrs. S. was calculated to deceive anyone. Fraud, within the meaning of RCW 26.33.160(3) or Hernandez, was not established.
The parents' evidence must also be considered in light of the public policy favoring finality in relinquishment proceedings. The relinquishment and adoption statutes are intended to protect the best interests of the child, to achieve finality in the placement of children, and protect new family relationships from disturbance by natural parents. In re Adoption of Crews, 60 Wn. App. 202, 211, 803 P.2d 24 (1991), aff'd, 118 Wn.2d 561, 825 P.2d 305 (1992); In re Adoption of Baby Girl K., 26 Wn. App. 897, 905, 615 P.2d 1310 (1980), review denied, 95 Wn.2d 1003 (1981). In this case, A. had already been voluntarily placed in foster care by her parents a few months after her birth, then reunited with them. She was in shelter care when the parents initiated relinquishment proceedings in lieu of foster care for an additional 8 to 10 months. At the *641 time of the hearing on the motion to revoke consent, A. was living with a family that wanted to adopt her. The trial court did not err in finding the parents had not supported their allegation of fraud with clear, cogent and convincing evidence. I would affirm.
After modification, further reconsideration denied June 26, 1992.
NOTES
[*] Judge Dale M. Green is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.
[1] A. was born in Washington in October 1988. Mr. and Mrs. S. had been referred to CPS services following her birth due to her failure to thrive.
[2] We note the dissent questions the accuracy of the facts as set forth above. We have reviewed the record and remain convinced that these facts are supported.
[3] The dissent cites Beckendorf v. Beckendorf, 76 Wn.2d 457, 457 P.2d 603 (1969), which sets forth the nine elements of common law fraud. However, Beckendorf is a real property case. It does not purport to define fraud as that term is used in RCW 26.33.160(3).
[4] We recognize that since the trial court granted the State's motion to dismiss at the close of the parents' case, the State did not present its case in chief at the hearing on the motion to vacate the relinquishment. However, such presentation is unnecessary because our decision is based primarily upon the record of the original relinquishment hearing which showed that the caseworker failed to clarify A.'s condition after the parents told the court A. had cerebral palsy. That record speaks for itself. Our decision is also based upon the parents' testimony as to the effect of the representation about cerebral palsy on their mental state and their consequent decision to relinquish, a subject about which outsiders could only speculate.
[5] Technically, DSHS did not request the parents' consent to relinquishment; they came to DSHS. Although relinquishment of the permanent custody of a minor child to an approved agency requires court authorization (RCW 26.33.090), the proceedings here were voluntary and nonadversarial. As this court has noted before, there is a substantial difference between adversarial dependency and termination proceedings on the one hand, and relinquishment upon the written consent of the parents on the other. In re Adoption of Hernandez, 25 Wn. App. 447, 452, 607 P.2d 879 (1980); see also In re Adoption of Crews, 60 Wn. App. 202, 217, 803 P.2d 24 (1991), aff'd, 118 Wn.2d 561, 825 P.2d 305 (1992).
[6] At the hearing on the motion to vacate the relinquishments, contrary to the majority's statement, Mrs. S. did not testify they were about to change their minds when the caseworker told them about the possibility of cerebral palsy. And Mr. S. actually testified: "We were thinking about discussing it more. Maybe we would have changed our mind[s]. We were just about to change our minds when she came up with that."