975 P.2d 1 (1999)
94 Wash.App. 582
In re the WELFARE OF MARY D.
Deborah W. and Michael D., Appellants,
v.
Department of Social and Health Services, Respondent.
In re the Adoption of Mary D.
Gregg McDonald and Mary McDonald, husband and wife, Appellants.
v.
Department of Social and Health Services; and Troy M. and Megan M., husband and wife, Respondents.
Nos. 16718-6-III, 16978-2-III.
Court of Appeals of Washington, Division 3, Panel Three.
January 26, 1999.
Publication Ordered March 23, 1999.
*2 W.R. Van Camp, Dustin D. Deissner, W.R. Van Camp P.C., Spokane, WA, for Appellant(s) and other parties.
Sonja L. Peterson, Cheryl L. Wolfe, Assistant Attorney General, Spokane, WA, for Respondent(s).
SCHULTHEIS, C.J.
Not long after their parental rights were terminatedone by voluntary relinquishment and one by defaultMary D's parents moved to set aside the terminations of rights. The trial court affirmed the court commissioner's ruling that denied the motion. The court also dismissed the adoption petition filed by Gregg and Mary McDonald, an Oregon couple who wished to adopt Mary. On appeal, Mary's birth mother argues that her relinquishment of rights was fraudulently obtained and Mary's birth father contends the State did not make a reasonable effort to secure personal service. In a consolidated appeal, the McDonalds contend the State's decision to place Mary with another couple was arbitrary and capricious. We affirm.

FACTS
Mary was born on December 10, 1989. Her mother and father are Deborah W and Michael D. The State of Washington removed Mary from Ms. W's home and obtained an order of dependency in 1994.[1] In 1996, Ms. W relinquished her parental rights. Later that same year, the court entered an order of default terminating Mr. D's parental rights after he failed to respond to service by publication. During this time, the State placed Mary with Megan and Troy M., who intended to adopt her.
On December 10, 1996, Ms. W and Mr. D filed a motion to set aside the orders terminating their parental rights to Mary. Ms. W alleged she signed the relinquishment of parental rights with the understanding and on the condition that the State would place Mary for adoption with the McDonalds. Mr. D contended the default order terminating his parental rights was void for want of personal jurisdiction. According to Mr. D, he had resided in Salinas, California, since the inception of the dependency in 1994. In his view, the State's attempts to locate him were inadequate. The motion to set aside states that both Ms. W and Mr. D planned to "request by separate motion an order allowing [the McDonalds] to progress with adoption proceedings." The State responded by citing RCW 26.33.160(3), which permits vacation of termination orders only upon proof of fraud.
The juvenile court commissioner first considered Mr. D's motion to set aside the default order terminating his parental rights. In an affidavit, Mr. D stated he was in contact with Mary's caseworker, Michael O'Grady, in 1994. According to Mr. D, he was living in Salinas, California, at the time, and Mr. O'Grady communicated with him both in letters sent to his Salinas address and by telephone. Nevertheless, he did not know the State had terminated his parental rights to Mary until Ms. W's counsel contacted him about setting aside the termination order.
Judy Kirking was Mary's caseworker at the time the State moved to serve the termination notice on Mr. D. by publication. She stated that she had attempted to contact Mr. D at his last known address in Salinas, but the mail she sent there was returned. She also spoke to Ms. W, who advised her that Mr. D was probably still in the Salinas area, but she did not have his current address. Ms. Kirking found in Mary's file a telephone number for the paternal grandparents. She called, but it was no longer their *3 number. Further, directory assistance in Salinas had no listing for Michael D or his parents.[2]
In considering Mr. D's motion to set aside the default, the court commissioner reviewed the file in Mary's dependency proceedings. The commissioner noted that the State had sent a notice of dependency to Mr. D at a Salinas address in December 1994. That notice was not returned. It sent notice of a second hearing in May 1995, and that notice was returned. The court also considered Mr. D's affidavit concerning his contacts with Mr. O'Grady but found it of little use. It did not state when he was in touch with Mr. O'Grady or what his address was at that time. Mr. D's appointed attorney appeared at a May 1996 review hearing and told the court he had no knowledge of Mr. D's whereabouts. Finally, the court observed that Mr. D. was not seeking custody of Mary. Instead, he stated he would be happy to have Mary adopted by the McDonalds. The commissioner concluded Mr. D's desire to direct the adoption was not a defense to termination and therefore could not support the finding of good cause needed to vacate the order of default.
On February 20, 1997, the commissioner conducted a hearing on Ms. W's motion to set aside her termination order. Ms. W testified that in the months prior to her relinquishment, she had maintained contact with Mary and another of her daughters. The State had placed both children in the foster care of John and Sue T, and the Ts planned to adopt Mary's half-sister, Georgia. At a birthday celebration in the Ts' home in February 1996, Ms. W met Mary and Gregg McDonald. The McDonalds are close friends of the Ts and expressed an interest in adopting Mary. Ms. W supported an adoption by the McDonalds, stating they had "similar ideals and goals" for Mary. And, because they were such good friends of the Ts, "the girls would have lots of contact with one another[.]" Ms. W also believed the McDonalds would allow her to continue to visit Mary after the adoption. At the time of the relinquishment, the McDonalds had submitted to the State's initial adoption procedures, including screening and investigation.
Carol Legg, Mary's guardian ad litem, testified that in early 1996, Sue T telephoned her. Mrs. T was concerned Ms. W would move her residence and would be unavailable to communicate her desire that the McDonalds adopt Mary. Ms. Legg told Mrs. T to have Ms. W contact her public defender. On April 4, 1996, Ms. W signed an affidavit stating she would like Mary to go to the McDonalds. Mrs. T mailed a copy of the affidavit to Ms. Legg.
During this same time period, Megan and Troy M expressed an interest in adopting Mary. They had become acquainted with her situation through Mrs. M's mother, who was the Ts' day-care provider for Georgia and Mary. Subsequently, the Ms were investigated and screened by the State. Ms. W met the Ms in May or June 1996 at a meeting arranged by Ms. Legg.
The commissioner also reviewed the record of the relinquishment hearing that was conducted on June 4, 1996. There, Ms. W responded to specific questions by the State's attorney and the court commissioner. She testified she freely and voluntarily and without pressure from the State relinquished her parental rights to Mary. She also testified she had not been offered or promised anything in exchange for signing the documents relinquishing her rights, nor was there any agreement between her and the foster parents. Ms. W stated she understood she might never again have contact with Mary or with her foster parents, even if "anybody [had] made [her] promises" in that regard. At the same hearing, caseworker Michael O'Grady told the court in Ms. W's presence that "[i]n Mary's case there [are] two adoptive families" and that he was in touch with both families.
We note that Ms. W's appointed public defender did not attend the relinquishment hearing. The court questioned her extensively about whether she had reviewed the relinquishment and termination documents with counsel and whether she wanted to have the hearing continued to a date when her *4 attorney would be available. Ms. W responded that counsel had gone over the documents with her and that she did not want a continuance. Ms. W does not contend the absence of counsel affected her ability to understand the proceedings. However, she now contends she agreed to waive presence of counsel because she believed her relinquishment was conditioned on the McDonalds adopting Mary.
Mr. O'Grady also testified at the hearing on Ms. W's motion to set aside the relinquishment and termination orders. He said he never saw Ms. W's April 4, 1996, affidavit that stated her wish that the McDonalds adopt Mary, but he had heard a reference to it in a staff meeting. He testified he informed her the State had not made a final decision on Mary's adoption and could not make any promises in that regard. Mr. O'Grady said he had discussed with Ms. W the two families the State was investigating and that "the bottom line" was Mary's best interests. Similarly, guardian ad litem Carol Legg testified the only promise she made Ms. W was that the decision would be in Mary's best interests.
The commissioner denied Ms. W's request to set aside the termination order. The commissioner relied upon Ms. W's statements at the relinquishment hearing that the State had not promised her anything in regard to Mary and on Mr. O'Grady's remark to the court in her presence that the State was investigating two adoptive homes. With respect to the latter fact, the court observed: "Very clearly, to anybody who heard that, is that there was no final decision made at that moment." The commissioner concluded Ms. W had not met her burden under RCW 26.33.160(3) of proving by clear, cogent and convincing evidence that the State obtained her consent to relinquish by fraudulently representing it would place Mary for adoption by the McDonalds.
Mr. D and Ms. W moved the superior court to revise the commissioner's rulings. On May 27, 1997, the trial court judge denied those motions after reviewing the record.
Following the commissioner's decisions, Mary and Gregg McDonald filed a petition to adopt Mary. In their petition, they noted the State had placed Mary with Troy and Megan M, despite the wishes of Mary's natural parents. The State moved to dismiss the McDonalds' petition. It relied in part on the declaration of Judy Kirking, who stated she had met with both the McDonalds and the Ms and was of the opinion that the Ms were the superior choice for Mary's adoption. Also, Mary needed an immediate placement in August 1996, and the Ms, but not the McDonalds, were already licensed for foster care. Ms. Kirking stated she had maintained contact with Mary since her placement with the Ms and believed their adoption of Mary was in the child's best interests. Mary's therapists, Carol Thomas and Laura Osburn, concurred in that opinion. Counsel for the Ms intervened for the limited purpose of joining the State's motion to dismiss the McDonalds' petition as a competing petition to their own petition to adopt Mary.
The trial court granted the State's motion to dismiss. The court found the State, as Mary's legal custodian, had standing to oppose the McDonalds' petition. It also granted the Ms' motion for limited intervention, given their status as the State's choice to be Mary's adoptive parents. The court found the McDonalds were not licensed foster care parents, nor had they met the preplacement requirements of RCW 26.34. Further, the State's decision to place Mary in the Ms' home in August 1996 was reasonable and in Mary's best interests. Affidavits from Mary's therapists stated their opinion that the Ms were better prepared to meet Mary's special needs as a child who had been sexually abused. The court specially found that "[t]o change Mary [D's] custodial situation now, even temporarily, would be very detrimental to Mary's health and emotional well-being." Accordingly, the court held the State's refusal to consent to the McDonalds' proposed adoption was in Mary's best interest and should not be waived.
Mr. D, Ms. W, and the McDonalds appeal. The State has moved to dismiss the D/W appeals on the merits. Our court clerk has referred the motion to the panel.[3] She also *5 granted the Ms' request to file a joint brief with the State in the McDonalds' appeal.

THE PARENTS' APPEALS
I. Ms. W's Voluntary Relinquishment of Parental Rights. RCW 26.33.160(3) provides that a mother or father may not revoke his or her relinquishment of parental rights, except for fraud practiced by the party obtaining the consent to relinquishment.[4] This court has defined "fraud" in this context as "anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed[.]" In re A.S., 65 Wash.App. 631, 634, 829 P.2d 791 (1992) (quoting In re Adoption of Hernandez, 25 Wash.App. 447, 455, 607 P.2d 879 (1980)). "Proof of fraud must be by clear, cogent and convincing evidence." A.S., 65 Wash.App. at 635, 829 P.2d 791 (citing Hernandez, 25 Wash.App. at 456, 607 P.2d 879).
Here, the issue presented for review is factual: Did Ms. W prove by clear, cogent and convincing evidence that the State obtained her consent to relinquish her parental rights by fraudulently representing to her that it would place Mary with the McDonalds for adoption? The evidence shows the opposite. All the parties knew there were two families that wished to adopt Mary, and all parties knew that the State had not made a decision about where to place Mary at the time of Ms. W's relinquishment. The trier of fact, in this case the commissioner, was free to weigh and reject Ms. W's testimony that Mr. O'Grady and Ms. Legg told her the McDonalds would be Mary's adoptive parents. Substantial evidence supports the conclusion Ms. W failed to produce clear, cogent and convincing evidence the State obtained her relinquishment by promising to place Mary with the McDonalds for adoption.
II. Mr. D's Default Termination of Parental Rights. In circumstances in which the challenged order of default recites service sufficient to confer jurisdiction, there exists a presumption of jurisdiction. Brennan v. Hurt, 59 Wash.App. 315, 318, 796 P.2d 786 (1990), review denied, 116 Wash.2d 1002, 803 P.2d 1310 (1991). However, the challenger can overcome that presumption by showing the publication was based on a defective affidavit. Id. In cases arising under RCW 4.28.100, which authorizes published service in certain actions, the courts have held the challenger must establish the plaintiff did not make an honest and reasonable effort to find the defendant. Carson v. Northstar Dev. Co., 62 Wash.App. 310, 315, 814 P.2d 217 (1991).
Applying Carson by analogy, substantial evidence exists here to support the superior court's decision that the published notice to Mr. D was appropriate. Mr. D had not kept in touch with Mary's caseworker. His own attorney did not know where he was. Mr. D's affidavit states Mr. O'Grady had communicated with him in the past at a Salinas address. But he does not state that that address was his address at the time of the termination. In the hearing on Ms. W's motion to set aside, held after the court commissioner had considered Mr. D's motion, Ms. W testified she knew how to get in touch with the paternal grandparents. But she does not state she informed the State of anything it could do other than what it had donecall the last telephone number it had on file for the grandparents and ask directory assistance in Salinas for a listing in the grandparents' names.
The State made an honest and reasonable effort to serve Mr. D. Accordingly, the superior court did not err in refusing to set aside the order terminating Mr. D's parental rights.

THE McDONALDS' APPEAL
The McDonalds contend the State was not justified in dismissing them as adoptive parents when the birth parents had picked them to adopt their child. Further, they argue the State denied them due process by refusing to place Mary with them so *6 that they could obtain a postplacement report. They fail to recognize that the primary role of the State is to pursue the best interests of the child, not of the prospective or birth parents.
In re Dependency of G.C.B., 73 Wash.App. 708, 870 P.2d 1037, review denied, 124 Wash.2d 1019, 881 P.2d 254 (1994), rejected the argument of the family seeking to adopt the child that agency consent was needed only for the final permission to adopt. The family contended that once it filed a petition to adopt, the agency had to place the child with it in order to prepare and file a postplacement report pursuant to RCW 26.33.200. The court disagreed, pointing out that adoption "is not a public forum open to any and every person who may wish to adopt." G.C.B., 73 Wash.App. at 719, 870 P.2d 1037. "Rather, ... the custodian plays an integral role in carrying out its legislatively mandated purpose of finding a proper adoptive home." Id. at 720, 870 P.2d 1037. Accordingly, "[h]aving been made the legal custodian of the child with the express right to place the child in a prospective adoptive home the Department has equal authority to withhold placement in the first instance." Id. at 721, 870 P.2d 1037 (emphasis omitted).
Here, the court reviewed the State's decision not to place Mary in the McDonalds' home and determined it was reasonable and not arbitrary and capricious. In other words, it was based on tenable reasonsthe opinions of counselors that the Ms offered the better placement. Nothing in the statutes requires the State as the child's custodian to place her in every home that wants to adopt her so that a postplacement report to the court can be made as to the home's appropriateness. And common sense indicates such a process would cause probable adverse effects to the child's emotional well being.
Affirmed. Because we decided this appeal on the briefs and the record, the State's motion on the merits is denied.
SWEENEY and BROWN, JJ., concur.
NOTES
[1] The record indicates the dependency was necessary because Ms. W was suffering from depression and suicidal thoughts. Mr. D lived in California and was in a drug abuse treatment program.
[2] In the later hearing on Ms. W's motion to set aside the termination of her parental rights, Ms. W testified she told the State she knew how to get in touch with Mr. D's mother or father.
[3] The State's motion was made in October 1998. It appears the clerk's decision was based on the fact the panel could hear the motion earlier than could a commissioner.
[4] In pertinent part, the statute provides that "a consent to adoption may not be revoked after it has been approved by the court. Within one year after approval, a consent may be revoked for fraud or duress practiced by the person, department, or agency requesting the consent...." RCW 26.33.160(3).